Filed 8/1/14  In re J.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.H., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E060277 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ1300350) |
| v. | OPINION |
| B.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Lawrence P. Best, Temporary Judge.  (Pursuant to Cal. Const., art VI, § 21.)  Affirmed.

Jacob Ivan Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, and Leslie E. Murad II, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant B.M. (Mother) appeals from the juvenile court's dispositional orders as to her two-year-old son J.H (the child).  Mother's sole contention on appeal is that the evidence was insufficient to support the removal of the child from Mother's care.  We reject this contention and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Mother became pregnant with the child at the age of 15.  The child was born in September 2011.  His father is R.H. (Father).[1]  In July 2013, Mother separated from Father, because according to Mother, Father "smoke[d] too much marijuana."  Mother then began living with the maternal grandfather.

On September 28, 2013, the Riverside County Department of Public Social Services (DPSS) received an immediate response referral alleging severe neglect of the child.  It was reported that Mother brought the child into the hospital for possible ingestion of a Dilaudid pill.  Mother was visiting her sister's home, and she and the child were napping.  When Mother woke up, the child was holding an open bottle of Dilaudid pills.  Mother called poison control and rushed the child to the emergency room.  Urine tests were run on the child at the hospital.  The tests came back positive for methamphetamine.  A physician's assistant reported that the child appeared to be asymptomatic and that the methamphetamine would stay in his system for 50 hours at

---

[1] Father is not a party to this appeal.

2

97 percent detectable. Based on further testing, it was believed that the child had ingested the methamphetamine sometime on September 26, 2013.

The social worker interviewed Mother. Mother did not know how the incident could have happened. Mother explained that she was taking a nap when the incident occurred. Mother had been staying with her older sister P.M. for the past week, and there was a girl living there named Angelic[2] who consumed drugs. Mother repeatedly stated that she had no idea why the tests came back positive for methamphetamine and that her son was with her at all times. Mother also noted that she was still breastfeeding her son. Mother's 22-year-old sister P.M.[3] and J.J., whose home Mother was staying at, stated that Mother was a good mother; that Mother did not use drugs; and that they did not know how the incident could have happened. J.J. also stated that there was no methamphetamine in the home. They stated that the methamphetamine had to be Angelic's because she is a prostitute. Father also stated that Mother did not use drugs.

Mother was given a field saliva drug test on September 28. The test came back negative. Mother had no prior criminal history or a history with child protective services.

An officer from the Cathedral City Police Department also interviewed Mother. Mother told the officer that she had been staying with her sister for the past week; that Angelic had not been at the home for the past three days; and that Mother and her son slept on the same couch as Angelic and that must be why the child tested positive for

---

[2] Angelic H. was originally misidentified as "Pricilla," and again as "Angelique."

[3] P.M. was originally misidentified as "Denise."

3

methamphetamine.  The officer informed DPSS that "it is definitely a case of neglect and child endangerment."  While the social worker was speaking with the officer, a security officer from the hospital called and informed the social worker that that she overheard J.J., Mother's sister P.M., and Mother's sister's girlfriend state that they better go and clean up the home because someone may search the home.

On October 1, 2013, a petition was filed on behalf of the child pursuant to Welfare and Institutions Code[4] section 300, subdivision (b) (failure to protect).  Specifically, the petition alleged that while in the care and custody of Mother, Mother had failed to adequately supervise her child, resulting in the child ingesting methamphetamine and being hospitalized; that Mother was unable or unwilling to explain how her son ingested the methamphetamine; that Mother had neglected the health and safety of the child by allowing her son to be around individuals known to abuse controlled substances; and that Father had abused controlled substances.  At the detention hearing, the child was formally removed from Mother's custody, and detained with Father on the condition that Father reside in the paternal grandparents' home and not allow Mother unauthorized visits.

In a jurisdictional/dispositional report, the social worker recommended that the allegations in the petition be found true; that the child be declared a dependent of the court; that the child be removed from Mother's custody; and that Mother be offered

---

[4]  All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

4

reunification services and Father be offered family maintenance services. Mother continued to state that she did not know "'how he got [the methamphetamine] in his system because [she] was supervising [her] kids.'" Mother explained that on the day of the incident, while her son was sleeping on a living room couch, she, her sister, her sister's girlfriend, and J.J. were in the girlfriend's bedroom with the door closed talking about what to do with Angelic.[5] While in the bedroom, Mother heard the child wandering around the house. When he came into the bedroom, he was carrying a metal box full of white pills. Mother did not know how long the child was unattended and wandering through the home or if the child had interacted with Angelic. Mother claimed that Angelic was a "'whore'" who made bad choices, but in this interview Mother denied having knowledge of Angelic using drugs.

The social worker concluded that it was unsafe to return the child to Mother's care and custody. This was due to Mother's failure to adequately supervise the child while she was temporarily residing with her sister whose roommate was involved in inappropriate activities, thereby placing the child at great risk. The social worker noted that Mother had admitted leaving the child unattended on a couch while she was behind closed doors; that it was unclear as to what was occurring in the bedroom and the activities occurring in the household; that Mother had admitted to residing with an individual whom she claimed was a prostitute; and that Mother had continued to expose

---

[5] Mother previously stated she had been "napping" and had been woken up by the child.

the child to this individual. The social worker opined that it was clear Mother's poor judgment and lack of insight had placed the child's health, well-being, and safety at a great risk.

On October 25, 2013, DPSS filed a first amended section 300 petition, adding allegations that Father's hair follicle test administered on October 18, 2013, tested positive for marijuana; that Father had admitted to using cocaine about two months ago; and that Father had changed his residence without authorization or notification to DPSS thereby violating the October 2, 2013 court order. On October 23, 2013, the paternal grandparents reported that Father and the child had moved out of their residence on October 21, and that they were unaware of the child's or Father's whereabouts. Father admitted moving out of his parents' home and informed the social worker that he had left the child in the care of Mother's sister P.M. while he worked his graveyard shift. The social worker was concerned that Father had left the child with the same maternal aunt whom Mother and the child were with when the child had ingested methamphetamine.

The child was placed into protective custody. At the detention hearing on the first amended petition, the child was formally removed from Father's custody.

In an addendum report, the social worker recommended that the allegations in the first amended petition be found true and that the child be removed from parental custody. The social worker also recommended that the parents be offered reunification services. The social worker noted that there were still questions as to how the child had ingested methamphetamine. The social worker speculated that the child could have ingested

methamphetamine from Mother, who had nursed the child until the time he was removed, or while Mother resided with her older sister P.M. The social worker further noted that while Mother's saliva drug test was negative, DPSS had not been able to obtain a hair follicle test on Mother to determine if Mother had a history of drug use.

The contested jurisdictional/dispositional hearing was held on November 7, 2013. At that time, the social worker testified in accordance with the submitted DPSS reports. The social worker reiterated that DPSS was concerned with Mother's lack of supervision of the child, poor judgment, negligent behavior in placing the child at risk, failure to protect, and the fact that no one knew how the child came to ingest methamphetamine. Following argument from counsel, the juvenile court found allegations b–1, b–3, and b–4 in the amended petition true and allegation b–2 not true. The child was declared a dependent of the court and removed from parental custody. The parents were provided with reunification services. This appeal followed.

II

DISCUSSION

Mother contends the juvenile court erred in removing the child from her custody because there was insufficient evidence to show that the child would be in substantial danger if returned to her care. We disagree.

In dependency proceedings, if a child is not returned to the original custodial parent's home at the dispositional phase, section 361, subdivision (c)(1), as relevant here, requires the juvenile court to find, by clear and convincing evidence, "[t]here is or would

7

be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the" child if he or she were returned home, and "there are no reasonable means by which" to protect the child absent removal from the parent's physical custody. (See also *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288.)  Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt.  (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 694-695.)  Clear and convincing evidence is required in order to protect the parents' constitutional rights to the care, custody and management of their children.  (*In re Henry V.* (2004) 119 Cal.App.4th 522, 529.)

"The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child.  [Citations.]"  (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, overruled on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.)  The court may consider past events in determining whether there is a danger to the child, and need not wait until the child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.  (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.)

While the juvenile court must find clear and convincing evidence, we determine whether substantial evidence supports the juvenile court's conclusion.  (*In re Javier G.* (2006) 137 Cal.App.4th 453, 462-463; *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)  "Substantial evidence" means such relevant evidence as a reasonable mind would accept as adequate

8

to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) In making our determination, all conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. (*In re E.B.* (2010) 184 Cal.App.4th 568, 575.)

Mother argues that her actions of allowing the child to nap on the maternal aunt's couch did not show she lacked judgment, had poor parenting skills, or displayed negligent behavior. She also asserts that upon discovering the child holding a metal box with his aunt's pills in it, she had immediately called poison control and rushed the child to the hospital. She further maintains that although it was unclear and troubling as to how the child had ingested methamphetamine, the record is clear that she had no history with drugs or DPSS and that she had tested negative for methamphetamine.

The juvenile court weighed these facts against the social worker's report that it was unsafe to return the child to Mother's care and custody due to Mother's failure to adequately supervise the child while she was temporarily residing with her sister. Mother's sister had a roommate who was involved in inappropriate activities, thereby placing the child at greater risk. The social worker concluded that it was clear Mother's poor judgment and lack of insight had placed the child's health, well-being, and safety at a great risk. Mother fails to recognize that it was not her actions of merely leaving the child unattended on the couch to nap that showed her lack of judgment, poor parenting skills, or negligent behavior, but her failure to properly supervise the child. The evidence

9

showed that the problem was much deeper than allowing the child to sleep on a couch; instead, it stemmed from a lack of concern regarding the dangers inherent in allowing a two-year-old to be left unattended in a home known to be occupied by an individual involved in illegal activities. In fact, due to Mother's negligent actions, the child ingested methamphetamine, thereby placing him at a serious risk of harm. It was undisputed that the child had ingested methamphetamine; that the child had been wandering his aunt's apartment when he awoke while Mother was in another room with the door closed; and that Mother was aware of her sister's roommate who was involved in prostitution and drugs. Moreover, it is undisputed that Mother could not explain how her child had ingested methamphetamine. The record clearly shows that Mother lacked supervisory skills, parenting skills, and good judgment.

Mother argues that the child could have safely been maintained in her care under family maintenance services in light of the fact that she was found to be credible to DPSS, displayed no pattern of evasiveness or lack of cooperation, and was ready to cooperate with DPSS under a family maintenance plan. The juvenile court reasonably could conclude, however, such a measure would be insufficient to protect the child, who was at risk of serious harm due to Mother's lack of or inadequate supervision, insight, and judgment. Given the evidence of a lack of parenting skills on the part of Mother and how the child had ingested methamphetamine, it was necessary for the child's protection to delay his return until Mother had shown the ability to benefit from intensive services.

In sum, we find substantial evidence supports the juvenile court's removal order.

10

## III

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

RICHLI

J.

MILLER

J.

11