Filed 1/25/16  In re J.L. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.L., a Person Coming Under the Juvenile Court Law. | B265226 (Los Angeles County Super. Ct. No. CK72596) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. DENISE L., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Terry T. Truong, Commissioner.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, Sarah Vesecky, Senior Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

The juvenile court sustained a Welfare and Institutions Code section 300[1] petition alleging that 13-year-old J.L. and nine-year-old E.L. came within the court's jurisdiction. On appeal, D.L. (mother) contends that the juvenile court's orders removing her children from her custody are not supported by substantial evidence. We affirm.

## BACKGROUND

### Prior Dependency Case

In May 2008, the Los Angeles County Department of Children and Family Services (Department) brought an action under section 300 alleging, in part, that J.L. and E.L. came within the juvenile court's jurisdiction due to mother's history of illicit drug use and current abuse of marijuana and methamphetamine. The juvenile court sustained the petition. The juvenile court removed J.L. and E.L. from mother's custody and ordered the Department to provide mother with reunification services. In June 2009, mother successfully completed a six-month inpatient program and had maintained a drug-free lifestyle for 12 months. Her stated primary concern was protecting J.L. and E.L. and providing them with a stable, safe, and nurturing home environment. In November 2009, the juvenile court returned J.L. and E.L. to mother's custody.

### Current Dependency Case

According to its February 3, 2015, Detention Report, on November 19, 2014, the Department received a referral alleging that mother was neglecting J.L. and E.L. The reporting party stated that J.L. was diagnosed with Bipolar Disorder and that he was not taking his medication as mother had failed to give it to him. The reporting party further stated that mother had alcohol and drug use habits and had been asked to leave her home two months prior due to her drug use. E.L. told E.N., J.L. and E.L.'s maternal great

---

[1] All statutory citations are to the Welfare and Institutions Code unless otherwise noted.

grandmother (MGGM), that mother and she stayed in mother's car or slept with "random male individuals who had offered mother shelter for the evenings."

MGGM expressed "high concern" for J.L. to a social worker because J.L. was off his medication and was not being followed by a mental health provider. MGGM said that as a tactical strategy, mother constantly threatened J.L. with calling the police to have him hospitalized. J.L. told the social worker that he wanted to stay with MGGM because mother did not have a place to live and frequently stayed in hotels or in other people's houses. According to J.L., the prior weekend he slept in mother's car while mother and E.L. slept in a trailer that belonged to a man named "Jerry." J.L. said that he had not seen mother use drugs, but he had seen her drink beer.

On December 8, 2014, the Department received an expedited referral alleging that mother and E.L. were in a traffic accident. The reporting party stated that after the accident, mother attempted to leave. During that attempt, mother turned her car and intentionally rammed into the victim's car. Mother then got out of her car and ran onto nearby railroad tracks. The reporting party said that E.L. sustained small scratches. E.L. and mother were transported to the hospital.

The social worker met with Whittier Police Department Officer Boyer. Officer Boyer stated that mother faced charges of hit and run, child endangerment, and assault with a deadly weapon. Officer Boyer told the social worker that E.L. told him that mother drank alcohol and had slapped her once about one year prior.

The social worker spoke with E.L. about the traffic accident. E.L. said a truck hit mother's car and mother was trying to get away. Mother told her to get out of the car and run. A man identified himself as "LAPD," and told mother to stop running. The man caught up with mother, and sat on her until the police arrived.

Based on the referral and subsequent investigation, J.L. and E.L. were taken into protective custody. They were placed with MGGM.

On December 10, 2014, mother contacted the social worker and reported she had been released from custody at the Whittier jail. The social worker met with mother and discussed the traffic accident. Mother said she rear-ended a truck after losing control of

3

her car. She said she fled because she feared for her and E.L.'s safety as the truck's owner "began to chase her down a residential area [at] high speeds." The social worker asked mother why she had not initially pulled over after she hit the truck. Mother responded, "I was trying to protect my daughter."

The social worker devised a safety plan to ensure the children would remain safe in mother's care. Pursuant to that plan, mother agreed to manage J.L.'s medication, to follow up with J.L.'s mental health provider, and to ensure that E.L. attended school daily. Mother agreed that she and E.L. would stay with Rose B., a family friend, and that J.L., who strongly expressed his desire not to live mother, could stay with MGGM. Mother also agreed that she would follow up with her therapist.

On December 19, 2014, Rose B. called the social worker and reported that mother and E.L. left her home. A couple of days prior, Rose B. confronted mother when mother came home intoxicated and accompanied by a male. Rose B. said she was concerned about E.L.'s safety in mother's care. Rose B. believed that mother was mentally unstable and that she had "no set boundaries when meeting random male individuals as evident how she 'hooked up' with this person."

On January 12, 2015, MGGM called the social worker and told her that she had overheard a telephone conversation between mother and J.L. in which mother said that she was "in" Orange County. MGGM believed that mother moved to Orange County to try to avoid the social worker. On January 15, 2015, mother left a voicemail for the social worker reporting that she and E.L. were safe and staying in Orange County. Mother said that there was no need for the social worker to look for them. The next day, the social worker called mother. Mother provided an address in Costa Mesa where she and E.L. were living.

On January 16, 2015, the social worker met with mother in a small, but "fairly clean and organized" trailer in a trailer park community. Mother told the social worker that she left Rose B.'s home because Rose B. had been intrusive in her personal life. After leaving Rose B.'s home, she had stayed in motels and with a friend. The social worker asked mother how she arranged to stay in the trailer. Mother said she met a

4

woman at the Salvation Army named Emily who "agreed to give her shelter." The social worker asked if mother was leasing the trailer. Mother responded that she was not, and that the trailer belonged to Doug W. Mother said that Doug W. also lived in the trailer, but he was then at work. Mother had met Doug W. "like 3 days ago."

On January 29, 2015, the social worker spoke with Doug W. He said that he had allowed mother to stay in his trailer for three or four days, but had asked her to leave because she brought another male to his home. Doug W. said mother had poor judgment, having left E.L. home alone one evening.

Based on the information available to her, the social worker determined that J.L. and E.L. were at a "very high risk for future abuse." She concluded that the children needed to be detained from mother.

On February 3, 2015, the Department filed a section 300 petition alleging that J.L. and E.L. were at risk of harm due to mother's failure to administer J.L.'s psychotropic medication and to obtain for J.L. recommended mental health treatment. The Department also alleged that the children were at risk due to mother's actions in a hit and run accident in which she intentionally rammed another car while E.L. was in mother's car.

On March 12, 2015, the Department filed a first amended section 300 petition that alleged, as ultimately sustained, that mother failed to protect her children under subdivision (b) as follows:

"[b-1] The child [J.L.] has mental and emotional problems, including a diagnosis of Bipolar Disorder. On a prior occasion, the child was hospitalized for the evaluation and treatment of the child's psychiatric condition. The child's mother, [D.L.], failed to administer the child's psychotropic medication as prescribed. The child's mother failed to obtain recommended mental health treatment for the child. Such medical neglect of the child [J.L.] on the part of the mother endangers the child's physical health and safety and places the child at risk of harm.

"[b-2] On 12/16/14, the children [J.L.] and [E.L.]'s mother, [D.L.], placed the child [E.L.] in a detrimental and endangering situation in that the mother was involved in a hit and run accident in which the mother struck another vehicle with the mother's

5

vehicle and fled the scene while the child was a passenger in the mother's vehicle, then again intentionally struck the same vehicle with the mother's vehicle while the child [E.L.] was a passenger in the mother's vehicle. The mother instructed the child [E.L.] to flee, for a second time, on foot. The child [E.L.] fell to the ground sustaining a scratch on the child's knee. The detrimental and endangering situation established for the child [E.L.] by the mother endangers the child's physical health and safety, and places the child and the child's sibling, [J.L.], at risk of harm.

"[b-3] The children [J.L.] and [E.L.]'s mother, [D.L.], has an unresolved history of illicit drug use including methamphetamine, marijuana and alcohol, which renders the mother incapable of providing regular care and supervision of the children. On 02/12/2015, the mother had a positive toxicology screen for marijuana. The mother's unresolved history of illicit drug use endangers the children's physical health, safety and well-being and places the children at risk of harm.

"[b-5] The children [J.L.] and [E.L.]'s mother, [D.L.] has failed to provide the children with appropriate care and supervision including the mother's failure to adequately feed the children and mother not having a stable home for them. The mother would not feed the child [E.L.] and the child [E.L.] would go to sleep hungry. Further, on or before May of 2014 the mother has been living a transient life style with the child [E.L.] The mother and the child, [E.L.] would not shower for days and mother would have her clean her teeth with napkins. Said conduct by the children's mother endangers the children' physical and emotional health and safety and places the children at risk of harm.

"[b-6] On prior occasions, the children [J.L.] and [E.L.]'s mother, [D.L.] inappropriately physically disciplined the child [E.L.], by striking the child. On a prior occasion, the mother slapped the child on her face and on her arms leaving red marks with her fingerprints. Such inappropriate physical discipline of the child by the mother endangers the child's physical health and safety, and places the child at risk of harm.

"[b-7] On prior occasions, the children [J.L.] and [E.L.]'s mother, [D.L.] inappropriately physically disciplined the child [J.L.], by striking and pinching the child.

6

On a prior occasion, the mother has hit the child, pinned him down to the floor and sat on top of him. Such inappropriate physical discipline of the child by the mother endangers the child's physical health and safety, and places the child at risk of harm."

In its March 16, 2015, Jurisdiction/Disposition Report, the Department reported that E.L. told a dependency investigator that when she misbehaved, mother hit her on her leg or hand. E.L. said that about one year prior, mother had slapped her face twice. E.L. did not sustain bruises when mother struck her, only redness. Asked if mother called her bad words or names, E.L. responded, "Yes she calls me 'you're such a bitch' and tells me 'fuck you'." E.L. stated that mother said to her, "I want to hurt you very badly."

E.L. told the investigator that mother disciplined J.L. by hitting him and pinning him down and sitting on him. E.L. described an incident about one year prior in which mother pinned down J.L. and he hit himself on the closet door and cracked it. MGGM told the investigator that mother hit J.L. "really hard," pinched him often, and punched him in the stomach while sitting on him with her knee on his neck. MGGM sometimes heard J.L. screaming. When she investigated, J.L. said that mother had pinched him. Mother told MGGM that J.L. was lying.

E.L. believed mother used drugs. According to E.L., mother became mean and rude when she took pills. Mother also drank about four to five cans of beer twice a day. Mother became aggressive when she drank, and got into verbal and physical altercations with her drinking companions in E.L.'s presence.

E.L. said after they moved out of MGGM's home, they stayed in a hotel or in people's back yards. She also said they stayed with people they had just met and "slept in random people's houses." Mother drank and used drugs with the persons with whom she and E.L. stayed. E.L. said they did not eat daily and she had gone to sleep hungry. E.L. had told mother she was hungry, but mother would not do anything.

In a March 30, 2015, last minute information for the court report, the Department informed the juvenile court that mother provided the Department with proof of enrollment in a substance abuse program. The program was to last a minimum of 24 weeks. The Department's May 27, 2015, Supplemental Report stated that mother had

7

tested negative for drugs and alcohol on February 12, 2015, and March 2, 2015, but the test results attached to the report reflect that mother tested positive for marijuana on February 12, 2015.[2]

According to the Supplemental Report, mother enrolled in a six-month residential treatment program on April 10, 2014.[3] According to mother's case manager at the treatment program, mother was participating in parenting classes, anger management groups, weekly individual counseling, relapse prevention, and random drug testing twice a month. Upon completion of the program, mother would be offered transitional housing.

At the jurisdiction/disposition hearing, the juvenile court sustained the counts pleaded under section 300, subdivision (b). It declared J.L. and E.L. to be dependents of the court, removed them from mother's custody, and ordered them suitably placed. The juvenile court ordered the Department to provide mother with family reunification services that included referrals for a substance abuse program, random or on-demand drug and alcohol testing, parenting, and individual counseling. Mother was to take all prescribed psychotropic medication. J.L. and E.L. were to participate in individual counseling.


## DISCUSSION

Mother contends that substantial evidence does not support the juvenile court's orders removing J.L. and E.L. from her custody. At a minimum, she contends, the juvenile court should not have removed E.L. from her custody. Substantial evidence supports the juvenile court's orders.

---

**2** On February 27, 2015, mother told a dependency investigator that she stopped smoking marijuana on February 6.

**3** The reference to 2014 and not to 2015 appears to be a typographical error.

8

# I.  Standard of Review

We review a juvenile court's dispositional orders to determine if substantial evidence, contradicted or uncontradicted, supports them.  (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Heather A.* (1996) 52 Cal.App.4th 183, 193 [although the standard of proof in the juvenile court to support a removal order is clear and convincing evidence, on appeal, an appellate court reviews the juvenile court's disposition order for substantial evidence]; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.)  We "'""review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].""'"  (*In re I.J., supra,* 56 Cal.4th at p. 773, internal citations omitted.)

# II.  Application of Relevant Principles

As relevant here, section 361, subdivision (c) prohibits the juvenile court from removing a child from his or her parents' custody "unless the juvenile court finds clear and convincing evidence [that] . . . :  [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (See also Cal. Rules of Court, rule 5.695(d)(1).)  "A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent.  [Citation.]  The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child.  [Citations.]" (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on another point in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.)

Mother contends that the issues that brought her children to dependency court and support the juvenile court's jurisdictional findings, do not support the orders removing J.L. and E.L. from her custody because she "was willing to comply with all court orders

9

and her behavior supported this assertion." Mother stated that she had enrolled in and was participating in individual counseling, Alcoholics Anonymous, and programs addressing substance abuse and domestic violence. She was participating in parenting, anger management, and relapse prevention services; she was "eventually drug testing negative"; and she was "set to obtain transitional housing." Substantial evidence supports the juvenile court's orders removing J.L. and E.L. from mother's custody.

Mother and her children were the subjects of a prior dependency case. In that case, the juvenile court removed J.L. and E.L. from mother's custody due to mother's substance abuse. Mother received services, and the children were returned to her. Notwithstanding mother's prior substance abuse and the resulting dependency case in which she lost custody of her children, mother has resumed her substance abuse. This time, however, in addition to her substance abuse, mother has engaged in conduct that either directly harmed the children physically or placed them at substantial risk of physical harm—i.e., she "inappropriately physically disciplined" J.L. and E.L.; she failed to administer J.L.'s prescribed psychotropic medication or obtain recommended mental health treatment for J.L.; after getting in a traffic accident, she rammed her vehicle into the other car with E.L. in her car; she and E.L., a young girl, lived in her car or slept with "random male individuals who had offered mother shelter for the evenings"; and mother attempted to contravene the safety plan by moving to Orange County and directing the social worker to not look for her. Mother's resumed substance abuse and other detrimental conduct with respect to her children, despite her knowledge that a dependency case might result and that she might lose custody of her children, demonstrate an apparent inability or unwillingness to protect and to care for her children properly.[4] Such evidence is substantial evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the

---

[4] In fact, mother admitted she used drugs even after the section 300 petition was filed on February 3, 2015.

10

minor's parent's . . . physical custody."  (§ 361, subd. (c)(1); Cal. Rules of Court, rule 5.695(d)(1).)

## DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


KUMAR, J.*


We concur:


KRIEGLER, Acting P. J.


BAKER, J.

---

*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.